**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**CASE NO. 24-cv-23330-ALTMAN**

**EMMANUEL JEAN**,

*Plaintiff*,

*v.*

**CITY OF NORTH MIAMI BEACH**,

*Defendant.*
_________________________________/

## ORDER ON MOTION TO DISMISS

Emmanuel Jean was tried, convicted, and sentenced to life in prison without parole for an armed robbery and murder he says he didn't commit. Seventeen years later, the Florida courts vacated his conviction because it relied on eyewitness testimony the investigating officer had fabricated. Jean now sues the city that investigated the murder for malicious prosecution. The city asks us to dismiss the case, arguing that it cannot be held liable for its officer's actions. After careful consideration, we grant the municipality's request but will allow Jean to file one more amended complaint.

### THE FACTS[1]

"On May 30, 2006, Mohammed [Ayoub] [the 'Victim'] was working in his family business on North Miami Beach Boulevard, in North Miami Beach, when youth entered his store, . . . with a gun, and attempted to rob Mr. Ayoub." Amended Complaint [ECF No. 30] (the "AC") ¶ 9. "In the ensuing scuffle, Mr. Ayoub was killed." *Ibid.* "Detectives Edward Hill ('Det. Hill') and then-Detective, later

[1] We accept the allegations of the Amended Complaint [ECF No. 30] as true for purposes of this Order. *See Dusek v. JPMorgan Chase & Co.*, 832 F.3d 1243, 1246 (11th Cir. 2016) ("In deciding a Rule 12(b)(6) motion to dismiss, the court must accept all factual allegations in a complaint as true and take them in the light most favorable to plaintiff, but 'legal conclusions without adequate factual support are entitled to no assumption of truth.'" (quoting *Mamani v. Berzain*, 654 F.3d 1148, 1153 (11th Cir. 2011) (cleaned up))).

Chief of Police Richard Rand ('Chief Rand') led the investigation into the killing of Mr. Ayoub." *Id.* ¶ 10.

"For some period of time before these events and continuing thereafter," our Plaintiff, Emmanual Jean, "and other Haitian American youth had been targeted by Detective Hill, in concert with other City police officers." *Id.* ¶ 15. On "July 18, 2026, two days before he was scheduled to start his studies at College of the Canyons, Santa Clarita, California, on a full football scholarship," Jean "was arrested and held without bond" in connection with Ayoub's murder. *Id.* ¶ 17. "Despite the fact that Det. Hill knew that [Jean] had not killed Mr. Ayoub," Detective Hill charged Jean "and two others . . . with first degree murder." *Ibid.* The charges were "based upon fabricated evidence and coerced testimony by Hill, Rand, and the City[.]" *Id.* ¶ 18. Specifically, Jean's "arrest and later conviction was based largely on the testimony of Enderson Joseph [ ], who Det. Hill persuaded to falsely identify [Jean] as the shooter." *Id.* ¶ 19. "When first questioned, Mr. Joseph specifically told Det. Hill, after having been shown a picture of [Jean], that [Jean] was not the shooter." *Ibid.* Detective Hill later told Joesph that he and other officers "knew" that Jean shot the Victim "because the very same gun used in the Ayoub crime had been used by [Jean] to kill another person, but [the police] had been unable to have a positive identification" of Jean in that case. *Id.* ¶ 20. Detective Hill thus "convinced Mr. Joseph to provide a false eyewitness identification, to 'put him away,' and to confirm that [Jean] was the shooter because Hill falsely proffered to Mr. Joseph that ***all of the evidence*** in both cases pointed to" Jean. *Ibid.*

Joseph "later swore" that Detective Hill told him that, "if he were to identify [Jean] as the shooter in this crime, the police could get [Jean] for the other crime as well." *Id.* ¶ 20. But "Det. Hill made up that story[.]" *Id.* ¶ 22. "In fact, the gun used to kill [the Victim] was never recovered, and Hill simply fabricated the supposed other 'murder' that [Jean] had committed." *Ibid.* "This fabrication

served to persuade Mr. Joseph to sign the photo and to testify against [Jean] at trial, despite having no basis for such testimony." *Ibid.* Ultimately, Joseph identified Jean as the shooter at trial. *See id.* ¶ 25 ("Mr. Joseph, at the urging and insistence of Det. Hill, even testified to that identification at trial[.]"). Joesph "later testified that he only identified [Jean] because of Det. Hill's urging, and because, at the trial, [Jean] was the only Black youth sitting next to defense counsel." *Id.* ¶ 24.

Not everyone testified against Jean, though. Jean's brother, Nahum, "testified at trial that Richard Petit ('Petit')"—one of Jean's co-Defendants—"telephoned" Nahum after the shooting and "told him that he, Petit, actually shot Mr. Ayoub, and that [Jean] had nothing to do with it." *Id.* ¶ 26. "Despite his testimony, none of Det. Hill, Chief Rand, or anyone else at the City, nor the state prosecutor . . . investigated those allegations." *Ibid.*

"On January 10, 2011, [Jean] was convicted of first-degree murder while possessing, displaying, and using a firearm, attempted armed robbery, and possession of a firearm during the crime, and conspiracy to commit an armed robbery" (the "Murder Conviction"). *Id.* ¶ 33. For these crimes, he was sentenced to "life imprisonment without parole." *Ibid.*

On April 27, 2023, Judge Miguel de la O, a state judge, "with the concurrence of the State, ordered [Jean] to be freed[.]" *Id.* ¶ 66.[2] According to Jean, Judge de la O "order[ed] the discharge of the 2011 judgment for first-degree murder and armed-robbery offenses because of Detective Hill's misconduct and *Brady* violations." *Ibid.* That same day, "the State filed a new Information charging

[2] Jean doesn't provide a case number for that action and doesn't attach Judge de la O's order. But "Federal Rule of Evidence 201 permits a federal court to take judicial notice of state-court records because, generally, those records 'can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned.'" *Cave v. Stone*, 2021 WL 4427451, at *2 (S.D. Fla. Sept. 27, 2021) (Altman, J.) (quoting FED. R. EVID. 201(b)); *Sullenberger v. City of Coral Gables*, 2025 WL 101703, at *3 (S.D. Fla. Jan. 15, 2025) (Altman, J.) ("[W]e may take judicial notice of state-court proceedings and pleadings in resolving a motion to dismiss."). We'll take judicial notice of that state-court docket here. *See State v. Jean*, No. F06-23563A (Fla. 11th Cir. Ct. Apr. 27, 2023).

only one count of conspiracy to commit strong-arm robbery[.]" *Id.* ¶ 67. Jean "pled guilty and received a five-year sentence with 1,646 days credit" (the "Strongarm Plea") and was immediately released from custody. *Ibid.* By then, he'd been incarcerated for nearly 17 years. *See id.* ¶ 18 (alleging that Jean was incarcerated "from July 28, 2006, through April 28, 2023").

On August 29, 2024, Jean sued the City, Detective Hill, and Chief Rand, asserting four claims: state-law false arrest (Count I), *see* Complaint [ECF No. 1] ¶¶ 61–67; state-law false imprisonment (Cout II), *see id.* ¶¶ 68–75; malicious prosecution (Count III), *see id.* ¶¶ 76–83; and deprivation of civil rights under 28 U.S.C. § 1983 (Count IV), *see id.* ¶¶ 84–95. The case was originally assigned to Judge Williams of our Court. *See* Notice of Assignment [ECF No. 2] ("Clerk's Notice of Judge Assignment to Judge Kathleen M. Williams.").

On February 20, 2025, Judge Williams dismissed Detective Hill and Chief Rand after finding that the "Plaintiff failed to file valid proof of serv[ice] on Defendants Edward Hill and Richard Rand by the Court's deadline." Paperless Order Dismissing Defendants [ECF No. 19]. On July 3, 2025, Judge Williams granted the City's First Motion to Dismiss [ECF No. 10] and dismissed Counts I and II of the Complaint as "time-barred." Order Granting First MTD [ECF No. 26] at 6. As to Count III, Judge Williams noted that "it is unclear whether Mr. Jean seeks relief under Florida common law or § 1983." *Id.* at 9. She nevertheless concluded that Jean had "not adequately pled a malicious prosecution claim under Florida law, which is a required element of a federal claim under § 1983," and she therefore dismissed this claim under either regime. *Id.* at 13. Finally, Judge Williams dismissed Count IV, which "assert[ed] a *Monell* claim against the City[.]" *Ibid.* In doing so, Judge Williams declined to assess the viability of Jean's *Monell* claim because neither party had addressed "the threshold question [of] whether the claim is barred by *Heck* [*v. Humphrey* 512 U.S. 477 (1994).]" *Ibid.*; *see also id.* at 14 ("At this stage, the Court cannot determine whether Mr. Jean's conviction was

invalidated in a manner that satisfies *Heck*, or whether the conviction remains valid."). Judge Williams granted Jean leave to file an amended complaint that "cure[s] the deficiencies in Counts III and IV" only. *Id.* at 15. Jean timely filed this Amended Complaint, which asserts two counts of *Monell* liability under § 1983. *See generally* AC.

Before we proceed, though, we need to clarify two things about Judge Williams's Order Granting First MTD. *First*, irrespective of Judge Williams's time-bar finding, Counts I and II of Jean's original Complaint plainly fail as a matter of law because a plaintiff cannot assert a false-arrest claim when his seizure "was effected through legal process[.] . . . In this circumstance, the claim is one for malicious prosecution rather than false arrest." *Wynn v. City of Griffin, Ga.*, 2019 WL 9088168, at *4 (N.D. Ga. Jan. 7, 2019), *aff'd*, 2021 WL 4848075 (11th Cir. Oct. 18, 2021). As the Eleventh Circuit has explained, "[a] claim of false arrest or imprisonment under the Fourth Amendment concerns seizures without legal process, such as warrantless arrests." *Williams v. Aguirre*, 965 F.3d 1147, 1158 (11th Cir. 2020). "Malicious prosecution, in contrast, requires a seizure pursuant to legal process" and includes "seizures following an arraignment [or] indictment[.]" *Ibid.* (cleaned up); *see also Elmore v. Fulton Cnty. Sch. Dist.*, 605 F. App'x 906, 915 (11th Cir. 2015) ("[S]eizures following the institution of a prosecution . . . generally serve as the basis for a § 1983 claim for malicious prosecution." (cleaned up)). In other words, Jean cannot attack his conviction and incarceration, which followed legal process (his indictment and jury trial), *see* Complaint ¶ 62 (alleging that Jean was "charged . . . with first degree murder, attempted armed robbery, and conspiracy to commit armed robbery"); *id.* ¶ 26 ("Following a seven-day trial . . . Jean was found guilty[.]"), by a false-arrest claim, *see id.* ¶ 69 (bringing a false-arrest claim under the theory that the Defendants "caused the false imprisonment of [Jean] for 16 years and 9 months"); *see also Aguirre v. Seminole Cnty.*, 158 F.4th 1276, 1301 (11th Cir. 2025) ("The gravamen of a malicious-prosecution claim is that a Fourth Amendment violation occurs when legal process itself

goes wrong," so this claim applies to "seizures following an arraignment, indictment, or probable-cause hearing."), *cert. denied sub nom. Birks v. Aguirre-Jarquin*, 2026 WL 3053360 (U.S. Oct. 13, 2026); *Heck*, 512 U.S. at 484 ("The common-law cause of action for malicious prosecution provides the closest analogy to claims of the type considered here because, unlike the related cause of action for false arrest or imprisonment, it permits damages for confinement imposed pursuant to legal process."); *Whiting v. Traylor*, 85 F.3d 581, 585 n.7 (11th Cir. 1996) ("Where an arrest is made after the filing of an information and the arrest is the basis of a Fourth Amendment section 1983 claim, we think the tort of malicious prosecution is the most analogous tort to the section 1983 claim.").

*Second*, as to Count III (malicious prosecution), Judge Williams correctly observed that "it is unclear whether Mr. Jean seeks relief under Florida common law or § 1983." Order Granting First MTD at 9. She then dismissed Count III under either reading, reasoning that Jean had "not adequately pled a malicious prosecution claim under Florida law, which is a required element of a federal claim under § 1983." *Id.* at 13. To reach that conclusion, Judge Williams outlined the governing standard this way: "To state a claim for malicious prosecution under § 1983, Mr. Jean must establish both: '(1) the elements of the common law tort of malicious prosecution, and (2) a violation of his Fourth Amendment right to be free from unreasonable seizures.'" *Id.* at 11 (quoting *Hardaway v. Dickerson*, 735 F. App'x 1003, 1005 (11th Cir. 2018)). Unfortunately, that's not quite right.

In 2020, the Eleventh Circuit rearticulated the elements of the claim of unlawful seizure pursuant to legal process under § 1983 (what we sometimes call "malicious prosecution"). *See Luke v. Gulley*, 975 F.3d 1140, 1143–44 (11th Cir. 2020). In doing so, the court explained: "We can simplify our standard for malicious prosecution into two elements: a plaintiff must prove (1) that the defendant violated his or her Fourth Amendment right to be free from seizures pursuant to legal process, and

(2) that the criminal proceedings against him or her terminated in his or her favor." *Ibid.*[3] Two years later, the Eleventh Circuit clarified that "[a] district court errs when it relies on modern tort law or the law of the forum state—for example, of Alabama, Georgia, or Florida—to resolve a claim of unreasonable seizure pursuant to legal process under section 1983, as occurred here." *Luke v. Gulley*, 50 F.4th 90, 97 (11th Cir. 2022); *see also id.* at 96 ("The district court also erred by using contemporary Georgia law to evaluate the detective's conduct."). Judge Williams thus erred when she applied "the elements of the common law tort of malicious prosecution" to Jean's § 1983 claim. Still, because Jean elected to replead his § 1983 malicious-prosecution claim—and since we're allowing him one more chance to amend it—any error in the Order Granting First MTD is harmless. We add here only that, in that amendment, Jean must plausibly allege facts that satisfy the simplified test the Eleventh Circuit set out in *Luke*.

In any event, on September 28, 2025, Judge Williams reassigned this case to Judge Artau, who had just been confirmed as a federal district judge. *See* Order Reassigning Case to Judge Artau [ECF No. 40]. On January 8, 2026, Judge Artau recused, and the case was reassigned to us. *See* Order of Recusal [ECF No. 50]. On May 22, 2026, the City filed its most recent Motion to Dismiss (the "MTD") [ECF No. 57].[4] This Order follows.

---

[3] "Before *Luke* [ ], a malicious-prosecution plaintiff needed to prove '(1) the elements of the common-law tort of malicious prosecution, and (2) a violation of her Fourth Amendment right to be free from unreasonable seizures.'" Eleventh Circuit Pattern Jury Instructions (Civil) 5.5, Annotations and Comments (2025) (quoting *Kingsland v. City of Miami*, 382 F.3d 1220, 1234 (11th Cir. 2004)). "The common-law elements of malicious prosecution require the plaintiff to establish 'that the officials instituted criminal process against him with malice and without probable cause and that the broader prosecution against him terminated in his favor.'" *Ibid.* (quoting *Laskar v. Hurd*, 972 F.3d 1278, 1292 (11th Cir. 2020) (cleaned up)).

[4] The MTD is now fully briefed and ripe for adjudication. *See* Response [ECF No. 61]; Reply [ECF No. 64].

## THE LAW

To survive a motion to dismiss under Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). To meet this "plausibility standard," a plaintiff must "plead[ ] factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Twombly*, 550 U.S. at 556). The standard "does not require 'detailed factual allegations,' but it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Id.* (quoting *Twombly*, 550 U.S. at 555). "[T]he standard 'simply calls for enough fact to raise a reasonable expectation that discovery will reveal evidence' of the required element." *Rivell v. Private Health Care Sys., Inc.*, 520 F.3d 1308, 1309–10 (11th Cir. 2008) (quoting *Twombly*, 550 U.S. at 556). "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Iqbal*, 556 U.S. at 678. "On a motion to dismiss, 'the court must accept all factual allegations in a complaint as true and take them in the light most favorable to plaintiff.'" *Core Distrib. v. World Trade Corp.*, 2026 WL 1251628, at *2 (S.D. Fla. May 7, 2026) (Altman, J.) (quoting *Dusek v. JPMorgan Chase & Co.*, 832 F.3d 1243, 1246 (11th Cir. 2016)).

## ANALYSIS

Jeans says that "Det. Hill was dirty and crooked." AC ¶ 70; *see also id.* ¶ 71 ("While Emmanuel was being prosecuted, convicted, and incarcerated, the City and the State Attorney knew that Det. Hill was an unreliable and untruthful witness."). He also claims that "[t]he City and the State knew this and knew that [Detective Hill's] testimony was unreliable and subject to challenge, but nonetheless took no action to uncover the perjury that he had orchestrated in [Jean]'s case." *Id.* ¶ 70. "Though the City

actually fired Det. Hill," Jean alleges that "it did so without prosecuting him for actions that constituted a crime under Florida" law. *Ibid.* Jean now seeks to hold the City liable because it "did nothing to inquire as to the legitimacy of the evidence and case against [Jean]." *Id.* ¶ 72. The City (Jean says) "knowingly supported the unconstitutional and malicious actions taken by Det. Hill and his colleagues against [Jean], and it was no [sic] through any action which the City should have taken that [Jean] was later released after having given up 16 years and 9 months of his young life." *Ibid.* In Jean's view, "[h]ad the City and the State properly investigated Det. Hill and taken appropriate actions based on its knowledge of Det. Hill's long pattern of misconduct, [Jean] would have been released on bail and he would not have spent 16 years and 9 months in jail for a crime that he did not commit." *Id.* ¶ 73. To establish this "long pattern of misconduct," Jean points to his own case and alleges that, after his arrest, "the North Miami Beach police [ ] used a six-pack collection of a majority of Haitian American children for firearm training exercise, which six-pack had a photo of then 14-year old [Jean] and another 15- year-old boy as two of the six individuals." *Id.* ¶ 15; *see generally* AC (alleging no other instance of malicious prosecution, perjury, or false testimony).

"In the Eleventh Circuit, a fabrication-of-evidence claim is really just a species of malicious prosecution." *Watkins v. Session*, 2021 WL 663762, at *10 (S.D. Fla. Feb. 19, 2021) (Altman, J.). "Put differently, in this Circuit, the right a fabrication-of-evidence claim vindicates is the right not to be prosecuted with fabricated evidence." *Ibid.* (collecting cases). Because Jean alleges that Detective Hill fabricated Joseph's testimony, Jean has properly brought his malicious-prosecution claims under § 1983.

The City asks us to dismiss the Amended Complaint under both *Heck* and *Monell*. As we explain below, Jean's claims are not barred by *Heck*, but the Amended Complaint fails to plead a viable *Monell* claim. We therefore **GRANT** the Motion to Dismiss.

## I. Jean's Claims aren't barred by *Heck*

In *Heck*, the Supreme Court held that, "in order to recover damages for [an] allegedly unconstitutional conviction or imprisonment, or for other harm caused by actions whose unlawfulness would render a conviction or sentence invalid, a § 1983 plaintiff must prove that the conviction or sentence has been reversed on direct appeal, expunged by executive order, declared invalid by a state tribunal authorized to make such determination, or called into question by a federal court's issuance of a writ of habeas corpus[.]" 512 U.S. at 486–87 (1994). "If 'a judgment in favor of the plaintiff would necessarily imply the invalidity of his conviction or sentence,' we must dismiss the claim unless the conviction or sentence has already been invalidated." *Manborde v. Suarez*, 2022 WL 2191638, at *2 (S.D. Fla. June 17, 2022) (Altman, J.) (quoting *Heck*, 512 U.S. at 487). "If, however, the plaintiff's cause of action 'would *not* demonstrate the invalidity of any outstanding criminal judgment,' then we can allow the claim to proceed." *Ibid.* (quoting *Heck*, 512 U.S. at 487).

### a. Scope of the *Heck* Bar

The City doesn't dispute that Judge de la O has already vacated Jean's Murder Conviction. *See* MTD (omitting any reference to the Murder Conviction); Reply (same). *Heck* thus cannot bar any claims that call into question the validity of *that* conviction. *See Phillips v. City of W. Palm Beach*, 2018 WL 3586179, at *12 (S.D. Fla. July 26, 2018) (Bloom, J.) ("As Plaintiff's claims for malicious prosecution are based solely on the convictions for conspiracy to distribute and distribution of crack cocaine—convictions that were vacated, the *Heck* doctrine does not bar his claims.").

Recognizing this, the City argues that the Amended Complaint actually implies the invalidity of the Strongarm Plea, which hasn't been vacated. In the City's view, the "Plaintiff's claims are barred by *Heck*" because "[the] Plaintiff pled guilty to conspiracy to commit strong arm robbery" and thus

"[a] ruling in his favor on the claims that the City's officers fabricated evidence and coerced witness testimony would necessarily undermine the validity of that conviction." MTD at 2.

Jean answers that "the conviction underlying the challenged confinement has already been invalidated"—and therefore "the *Heck* requirement is met, and the claim may proceed." Response at 4. According to Jean, since "[t]he only conviction that remains is the separately-filed charge of conspiracy to commit strong-arm robbery, which was not among the original charges and not a basis for [the] Plaintiff's wrongful incarceration," *Heck* doesn't bar his claims. *Id.* at 5. In support of this argument, Jean offers two observations. *First*, he says, the penalty he received for the Strongarm Plea was five years in prison—so it "could not, under any circumstances, have supported a 16-year incarceration." *Ibid. Second*, he explains, "the charge of conspiracy to commit strong-arm robbery does not require proof that [the] Plaintiff shot anyone, used the never-recovered firearm, or committed the Ayoub murder, and so does not implicate the fabricated evidence at the heart of [the] Plaintiff's claims." *Ibid.* We agree with Jean that his claims aren't barred by *Heck*.

**b. The Amended Complaint Doesn't Imply the Invalidity of the Strongarm Plea**

In so holding, we find two facts instructive. *First*, Jean served sixteen years in prison for his Murder Conviction but pled only to a five-year sentence under the Strongarm Plea. *See* AC ¶ 18 (alleging that Jean was incarcerated "from July 28, 2006, through April 28, 2023"). He's thus seeking damages for a vacated murder conviction that resulted in eleven extra years of imprisonment. *Second*, after the Murder Conviction was vacated, Jean pled guilty to a single count of conspiracy to commit strong-arm robbery, which wasn't included in the murder case. *See* AC ¶ 37 ("[The] State agreed to the reversal of the first-degree murder conviction while possessing, displaying, and using a firearm, attempted armed robbery, possession of a firearm during the crime, and conspiracy to commit an armed robbery charges[.]"); *id.* ¶ 38 (noting that Jean pled guilty to "conspiracy *to commit a strong arm*

*robbery*"). There's therefore no extant conviction to support *any* of the charges Jean took to trial—charges for which he spent almost 17 years in prison.

Although the Eleventh Circuit has yet to consider the viability of a § 1983 malicious-prosecution claim in these circumstances, the Ninth and Second circuits have. In *Poventud v. City of New York*, 750 F.3d 121 (2d Cir. 2014), the defendant, "Poventud[,] was convicted [at trial] of attempted murder in the second degree and several other related crimes." *Id.* at 124. Six years later, Poventud "successfully brought a state collateral challenge to his conviction based on" *Brady*, and "[h]is conviction was vacated and a new trial ordered." *Ibid.* Poventud then "pled guilty to the lesser charge of attempted robbery in the third degree, pursuant to a plea agreement that dismissed all other charges and stipulated to a one-year sentence (time already served)." *Ibid.* "Upon entry of the plea, Poventud was immediately released." *Ibid.* He then "sued the City of New York and various police officers alleging a violation of his constitutional rights in his 1998 trial." *Ibid.* But "the district court determined that Poventud's § 1983 claims called into question the validity of his 2006 plea and granted summary judgment for the defendants." *Ibid.* The district court "based its decision on a long-standing Supreme Court decision, *Heck v. Humphrey,* 512 U.S. 477 (1994), that precludes the use of § 1983 suits for damages that necessarily have the effect of challenging existing state or federal criminal convictions." *Ibid.*

The en banc Second Circuit reversed, reasoning that "Poventud did exactly what *Heck* required of him"—*viz.*, "he secured a state court judgment vacating his 1998 conviction." *Id.* at 124. "*Heck*, therefore, does not bar Poventud's claims." *Ibid.* In the court's view:

> [Poventud] asserts that members of the New York City Police Department willfully withheld exculpatory evidence that called into question the testimony of the only witness to place him at the scene of the crime. Poventud's claims are not the stuff of prison idleness or self-absorption; he has proven his claims in state court and the State elected not to appeal his victory. Poventud's conviction was vacated because it rested on a constitutional infirmity. Armed with the information previously denied him,

> Poventud accepted an offer from the State to plead to a lesser offense. He now seeks to recover from those who violated his right to a fair trial. He does not contest the legitimacy of his plea (nor could he). His claim is restricted to the acts of the police officers before and during his trial in 1998. Poventud's victory in state court, securing vacatur of his jury trial conviction, gave life to his claim and separated it from the criminal activity that took place in the Bronx on March 6, 1997. Had Poventud claimed that the entire criminal process was one borne of malice, then our decision would be different. But his claims are circumscribed to the misdeeds of the police prior to his jury trial, and nothing more.

*Id.* at 138. At the same time, the Second Circuit made clear that any damages Poventud *might* recover must "exclude[ ] the time that he served pursuant to his unchallenged 2006 guilty plea." *Id.* at 137.

The Ninth Circuit came out the same way in *Taylor v. County of Pima*, 913 F.3d 930 (9th Cir. 2019). "In 1972," that court explained, "a jury convicted [the defendant] Louis Taylor in Arizona state court of 28 counts of felony murder, on the theory that he had started a deadly fire at a Tucson hotel." *Id.* at 932. "In 2012," however, "while still in prison, Taylor filed a state post-conviction petition advancing newly discovered evidence: an expert, using new and more sophisticated investigative techniques, determined that arson did *not* cause the hotel fire." *Ibid.* "The government and Taylor [subsequently] entered into a plea agreement in 2013 under which the original convictions were vacated and, in their place, Taylor pleaded no contest to the same counts, was resentenced to time served, and was released from prison." *Ibid.* Taylor then sought § 1983 "damages for wrongful incarceration stemming from the 42 years that he spent in prison." *Id.* at 935. Like the Second Circuit, the Ninth concluded that "*Heck* does not bar Taylor from raising claims premised on alleged constitutional violations that affect his 1972 convictions but do not taint his 2013 convictions." *Ibid.* (cleaned up). At the same time, because "all of the time that Taylor served in prison is supported by the valid 2013 state-court judgment," "even if Taylor proves constitutional violations concerning the 1972 conviction, he cannot establish that the 1972 conviction caused any incarceration-related damages." *Ibid.* The Ninth Circuit therefore found that, while Taylor could properly raise a § 1983

claim based on his vacated conviction, he couldn't recover damages because his plea deal supported the *entirety* of his conviction. *See ibid.* ("As a matter of law, the 2013 conviction caused the entire period of his incarceration.").

We're also guided by the Eleventh Circuit's decision in *Luke*. The plaintiff there was arrested "on a charge of felony murder." 975 F.3d at 1142. He ultimately "allocuted and testified against other defendants in the prosecution" in exchange for a "*nolle prosequi*" that "dismissed the charges against" him. *Id.* at 1143. The Eleventh Circuit held that Luke *could* bring a malicious-prosecution claim for those dismissed charges because his "complaint does not eliminate every reasonable inference that he did not admit that he was guilty of felony murder." *Id.* at 1145. In saying so, Chief Judge Pryor, writing for the court, reasoned that a § 1983 claim wasn't barred "unless the prosecution terminated [ ] his conviction on [an] admission of guilt to *each charge* that justified his seizure." *Ibid.* (emphasis added). *Luke* reaffirmed the principle the Eleventh Circuit had articulated a few months earlier in *Lasker v. Hurd*, 972 F.3d 1278 (11th Cir. 2020), where Chief Judge Pryor—again writing for the court—explained that "the favorable-termination requirement will bar a suit for malicious prosecution only when the prosecution remains ongoing or terminates in a way that precludes *any* finding that the plaintiff was innocent of the *charges that justified his seizure*—that is, when the prosecution ends in the plaintiff's conviction on or admission of guilt to *each charge that justified his seizure*." *Id.* at 1293 (emphases added).

Taking all four of these decisions together, we don't think *Heck* bars Jean's malicious-prosecution claim here because, like *Luke*, his "complaint does not eliminate every reasonable inference that he did not admit that he was guilty of" the vacated murder and armed-robbery charges. 975 F.3d at 1145. Indeed, the vacatur of his Murder Conviction and the acceptance of his Strongarm Plea imply that he is *not* guilty of those vacated charges. And it doesn't matter that the fabricated

Joseph testimony may well have formed the basis of the Strongarm Plea because the rule in our Circuit is that a malicious-prosecution claim is viable if even *one* of the indictment's multiple counts was vacated. *See Luke*, 975 F.3d at 1145 ("Luke has alleged that his prosecution formally ended when the trial court dismissed all charges against him, so he will satisfy the requirement unless the prosecution terminated with his 'conviction on or admission of guilt to *each charge* that justified his seizure.'" (emphasis added) (quoting *Laskar*, 972 F.3d at 1293)).

To understand why this rule, as articulated in *Laskar* and reiterated in *Luke*, resolves our case, imagine that all the counts against Jean—the original vacated counts and the new strongarm-robbery conspiracy—had been included in one indictment. In our Circuit, if his conviction on all *but one* of those counts had been vacated, that vacatur could sustain, over a *Heck* bar, a viable malicious-prosecution claim as to the vacated counts, despite the presence of the remaining count. *See Laskar*, 972 F.3d at 1293 ("In the light of this limited role, the favorable-termination requirement will bar a suit for malicious prosecution only when the prosecution remains ongoing or terminates in a way that precludes any finding that the plaintiff was innocent of the charges that justified his seizure—that is, when the prosecution ends in the plaintiff's conviction on or admission of guilt to *each charge* that justified his seizure." (emphasis added)); *Luke*, 975 F.3d at 1145 ("The warrant that justified [the plaintiff's] pretrial detention rested on [the defendant's] accusation that he was guilty of felony murder. So to be 'unfavorable,' the dismissal must rest on Luke's admission of guilt to that charge."); *see also Williams*, 965 F.3d at 1165 ("Williams need only prove that probable cause was absent for *at least one* of the two attempted murder charges that justified his seizure." (emphasis added)); *Uboh v. Reno*, 141 F.3d 1000, 1005 (11th Cir. 1998) ("The fact that the allegations concerning drug trafficking were included alongside other charges for which Uboh ultimately *was* convicted does not alter our conclusion that the prosecutor's decision to dismiss the drug counts constituted favorable termination,

particularly under the facts of this case." (emphasis in original)). Given this rule, it would make no sense to treat Jean differently simply because his two sets of counts—the vacated counts and the sole remaining count—were included in two separate indictments. Of course, we agree, consistent with *Taylor* and *Poventud*, that Jean cannot recover for the five years he spent in custody pursuant to the Strongarm Plea. *Cf. Laskar*, 972 F.3d at 1295 ("And a plaintiff seized without probable cause must prove he suffered an injury to recover compensatory damages for the specific charges he says were unfounded.").

We therefore conclude that the Supreme Court's holding in *Heck*—that a legally valid conviction prevents a suit "to recover damages for allegedly unconstitutional conviction or imprisonment"—applies only until that "conviction or sentence has been," as here, "declared invalid by a state tribunal[.]" *Heck*, 512 U.S. at 486–87. As Judge Lynch, concurring in *Poventud*, explained: The vacated "conviction exists no longer; a state court declared it invalid, and we must accept the outcome of the legal process that holds him not guilty of those offenses." *Poventud*, 750 F.3d at 141–42 (Lynch, J., concurring). In other words, Jean may bring his § 1983 challenge to his Murder Conviction because that conviction has been vacated.

## II. *Monell*

Jean seeks to impose liability on the City for Detective Hill's alleged misconduct.[5] "It has been blackletter law for nearly fifty years that 'a municipality cannot be held liable under § 1983 on a *respondeat superior* theory.'" *Megladon, Inc. v. Vill. of Pinecrest*, 2025 WL 1517181, at *31 (S.D. Fla. May 28, 2025) (Altman, J.) (quoting *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 690 (1978)); *see also Huggins v. Sch.*

[5] Because Jean failed to serve *either* Detective Hill or Chief Rand in time, Judge Williams dismissed those Defendants from the case. *See* Paperless Order Dismissing Defendants ("Plaintiff failed to file valid proof of serve on Defendants Edward Hill and Richard Rand by the Court's deadline.").

*Dist. of Manatee Cnty.*, 151 F.4th 1268, 1285 (11th Cir. 2025) ("Under the *Monell* line of cases, a municipality does not incur Section 1983 liability solely because of its employer-employee relationship with an alleged wrongdoer."). Instead, "[a] municipality or other local government may be liable under [§ 1983] if the governmental body itself 'subjects' a person to a deprivation of rights or 'causes' a person 'to be subjected' to such deprivation." *Connick v. Thompson*, 563 U.S. 51, 60 (2011). In other words, "under § 1983, local governments are responsible only for 'their *own* illegal acts.'" *Ibid.* (quoting *Pembaur v. Cincinnati*, 475 U.S. 469, 479 (1986)). And "a municipality may be held liable only if such constitutional torts result from an official government policy, the actions of an official fairly deemed to represent government policy, or a custom or practice so pervasive and well-settled that it assumes the force of law." *Doe v. Sch. Bd. of Broward Cnty.*, 604 F.3d 1248, 1263 (11th Cir. 2010) (cleaned up).

**a. Count I must be dismissed as duplicative**

Jean asserts two counts against the City: a direct § 1983 claim for malicious prosecution (Count I); and a municipal-liability claim under *Monell* (Count II). But, as the City points out, those claims are duplicative. *See* MTD at 1 ("The claims are duplicative."); *id.* at 4 ("Counts I and II are duplicative. . . . In both counts, Plaintiff sued the City for malicious prosecution."). Faced with this obvious defect, Jean says that, "[r]ead together, as they must be (each count incorporates paragraphs 1 through 77), the two counts state a coherent theory of municipal § 1983 liability, and are complementary, not redundant, because they plead different required elements." Response at 10. We disagree.

It's black-letter law that "separate counts of the complaint must be read separately." *Wagner v. First Horizon Pharm. Corp.*, 464 F.3d 1273, 1278 (11th Cir. 2006); *see also Johnson Enters. of Jacksonville, Inc. v. FPL Grp., Inc.*, 162 F.3d 1290, 1333 n.96 (11th Cir. 1998) ("This flies in the face of the requirement that each claim for relief should be stated in a separate count."). And Jean cites no case (and we have

found none) for the opposite proposition—*i.e.*, that they should be read *together*. "The law is well-settled that 'perfunctory, undeveloped arguments without discussion or citation to pertinent legal authority are [forfeited]." *Michaels v. Sasser's Glass Works Inc.*, 662 F. Supp. 3d 1223, 1243 (S.D. Fla. 2023) (Altman, J.), *aff'd*, 2025 WL 588648 (11th Cir. Feb. 24, 2025) (quoting *Mahaffey v. Ramos*, 588 F.3d 1142, 1146 (7th Cir. 2009)).[6]

We therefore dismiss Count I for two reasons. *First*, Jean *admits* that Counts I and II "plead different required elements" for the *same* cause of action and seek identical relief. Response at 10. Counts I and II, in short, improperly assert duplicative claims. *See Manning v. Carnival Corp.*, 2012 WL 3962997, at *2 (S.D. Fla. Sept. 11, 2012) (Altonaga, J.) ("Duplicative claims are those that stem from identical allegations, that are decided under identical legal standards, and for which identical relief is available. To promote judicial economy, a court should dismiss claims that are duplicative of other claims."). *Second*, Jean acknowledges that Count I doesn't satisfy the strictures of *Monell*, which is the only way a City can become liable under § 1983 for the unconstitutional acts of its employees. *See* Response at 10 ("Count I pleads the underlying constitutional violation . . . [, while] Count II pleads the predicate for municipal liability under *Monell*[.]"); *Plowright v. Miami Dade Cnty.*, 102 F.4th 1358, 1370 (11th Cir. 2024) ("Counties and other municipal entities may be held liable under § 1983 only where action pursuant to official municipal policy of some nature caused a constitutional tort." (cleaned up)). We therefore **GRANT in part** the Motion to Dismiss and **DISMISS** Count I as duplicative.

---

[6] *See also U.S. Steel Corp. v. Astrue*, 495 F.3d 1272, 1287 n.13 (11th Cir. 2007) ("We will not address this perfunctory and underdeveloped argument."); *United States v. Campbell*, 26 F.4th 860, 873 (11th Cir. 2022) ("[F]ailure to raise an issue in an initial brief . . . should be treated as a [forfeiture] of the issue, and therefore the issue may be raised by the court sua sponte [only] in extraordinary circumstances."); *Hamilton v. Southland Christian Sch., Inc.*, 680 F.3d 1316, 1319 (11th Cir. 2012) ("[T]he failure to make arguments and cite authorities in support of an issue [forfeits] it."); *In re Egidi*, 571 F.3d 1156, 1163 (11th Cir. 2009) ("Arguments not properly presented . . . are deemed [forfeited].").

**b. Count II fails to properly allege *Monell* liability**

"A plaintiff can establish municipal liability under *Monell* in three ways: (1) identifying an official policy; (2) identifying an unofficial custom or widespread practice that is so permanent and well settled as to constitute a custom and usage with the force of law; or (3) identifying a municipal official with final policymaking authority whose decision violated the plaintiff's constitutional rights." *Neighbors & Neighbors Ass'n, Inc. v. Hardemon*, 2026 WL 2083282, at *4 (S.D. Fla. July 20, 2026) (Altman, J.) (quoting *Tundidor v. Hernandez*, 2026 WL 1800959, at *4 (S.D. Fla. June 23, 2026) (Altman, J.) (cleaned up)).

The Amended Complaint is no model of clarity. *See generally* AC. As to *Monell*, it devotes only a single paragraph: "[T]he City of North Miami Beach," it says, "through official policy, practice, or custom, (a) failed to train officers on Brady disclosure and non-suggestive identification procedures, (b) tolerated racial profiling of Haitian-American males, and (c) ratified Detective Hill's fabrications notwithstanding repeated Internal-Affairs findings, thereby exhibiting deliberate indifference to constitutional rights." *Id.* ¶ 91. From this, Jean appears to be advancing three theories of municipal liability: (1) a failure-to-train theory; (2) a theory based in a practice of racial profiling; and (3) a ratification theory. Since Jean adduces no facts for any of these three theories, however, his Amended Complaint fails to advance a viable *Monell* claim.

**a. Failure to Train**

"The Supreme Court has held that, in 'limited circumstances,' a municipality may be liable for fail[i]ng to train or supervise its employees." *Rebalko v. City of Coral Springs*, 2020 WL 6446042 (S.D. Fla. Nov. 3, 2020) (Altman, J.) (quoting *City of Canton v. Harris*, 489 U.S. 378, 387 (1989)). "A municipality's culpability for a deprivation of rights is at its most tenuous where a claim turns on a failure to train." *Connick*, 563 U.S. at 61 (citing *Okla. City v. Tuttle*, 471 U.S. 808, 822–823 (1985)

(plurality opinion) ("[A] 'policy' of 'inadequate training'" is "far more nebulous, and a good deal further removed from the constitutional violation, than was the policy in *Monell*.")). "To satisfy the statute, a municipality's failure to train its employees in a relevant respect must amount to 'deliberate indifference to the rights of persons with whom the untrained employees come into contact.'" *Ibid.* (quoting *Canton,* 489 U.S. at 388). A municipality exhibits deliberate indifference when it "knew of a need to train and/or supervise in a particular area and the municipality made a deliberate choice not to take any action." *Gold v. City of Miami*, 151 F.3d 1346, 1350 (11th Cir. 1998). The Eleventh Circuit "repeatedly has held that without notice of a need to train or supervise in a particular area, a municipality is not liable as a matter of law for any failure to train and supervise." *Id.* at 1351.

"Establishing notice of a need to train or supervise is difficult." *Am. Fed'n of Lab. & Cong. of Indus. Orgs. v. City of Miami*, 637 F.3d 1178, 1189 (11th Cir. 2011). To establish notice, "[a] plaintiff must allege 'a pattern of similar constitutional violations by untrained [or unsupervised] employees[.]'" *Connick*, 563 U.S. at 62 (quoting *Bryan Cnty. v. Brown*, 520 U.S. 397, 409 (1997)). In such cases, the city's "continued adherence to an approach that they know or should know has failed to prevent tortious conduct by employees may establish the conscious disregard for the consequences of their action—the 'deliberate indifference'—necessary to trigger municipal liability." *Bryan Cnty.*, 520 U.S. at 407.

Unfortunately, the Amended Complaint alleges no facts that might plausibly suggest a pattern of similar constitutional violations. Indeed, as evidence of deliberate indifference, Jean points *only* to Detective Hill's actions against him and his co-defendants *in this case.*[7] In other words, he has

---

[7] *See, e.g.*, AC ¶ 13 ("This intentional violation to Emmanuel's rights was known and actively propagated by the City, its managers, and its policy decision-makers began and continued prior to his trial, at and subsequent to his conviction, and incarceration, as well to the many attacks on his judgment of guilt advanced on his behalf, during which the City maintained its incriminating silence. These actions constituted a policy or custom made by those whose edicts and acts may fairly aid to represent official policy, and although not authorized by written law or an express policy, is so permanent and well settled as to constitute a custom or usage with the force of law."); *id.* ¶ 56 ("Det.

"identified *no other* instance" in which any City officer pressured a witness, fabricated evidence, or maliciously prosecuted a criminal defendant. *Rebalko*, 552 F. Supp. 3d at 1225. And the law is well-settled that "merely citing one's own personal experience, without more, is insufficient to show a longstanding and widespread practice." *Derks v. Bassa*, 2023 WL 5664197, at *2 (11th Cir. Sept. 1, 2023) (per curiam); *see also Owaki v. City of Miami*, 491 F. Supp. 2d 1140, 1158 (S.D. Fla. 2007) (King, J.) ("A failure to stop mere isolated incidents cannot be deemed tacit approval: 'random or isolated incidents are insufficient to establish a custom or policy.'" (quoting *Depew v. City of St. Marys*, 787 F.2d 1496, 1499 (11th Cir. 1986)); *Waters v. City of Coconut Creek*, 2024 WL 3649854, at *5 (S.D. Fla. Aug. 5, 2024) (Singhal, J.) ("Municipal liability under § 1983 for failure to train or supervise cannot be based on a single incident."); *Marantes v. Miami-Dade Cnty.*, 649 F. App'x 665, 673 (11th Cir. 2016) (holding that the plaintiff's "allegations do not show that the County had a 'longstanding and widespread practice' of encouraging excessive force" because the plaintiff "pointed to only one incident [ ] to show that the internal affairs process was ineffectual by custom—his own experience").

Jean has thus failed to show that the City had notice of any failure "to train officers on *Brady* disclosure and non-suggestive identification procedures[.]" AC ¶ 91. And, "[w]ithout notice that a course of training is deficient in a particular respect, decisionmakers can hardly be said to have

---

Hill was the driving force behind the false arrest and prosecution of Emmanuel—a man that the City and its police department knew was a bad cop, a liar, and who even tried to slap Emmanuel with an unrelated murder for hire plot from the jail to further contaminate the jury pool and besmirch his reputation."); *id.* ¶ 63 ("At all times material to this action the City through its employees, servants, agents, and representatives did intentionally arrest and leave Emmanuel in prison to cover up the handiwork of their disgraced detective, whose conduct was known to the top echelons of the City and the Police Department."); *id.* ¶ 70 ("Det. Hill was dirty and crooked. The City and the State knew this and knew that his testimony was unreliable and subject to challenge, but nonetheless took no action to uncover the perjury that he had orchestrated in Emmanuel's case.").

deliberately chosen a training program that will cause violations of constitutional rights." *Connick*, 463 U.S. at 62.[8]

Resisting this conclusion, Jean points us to the "approximately 89 pages of Internal Affairs materials documenting Detective Hill's truthfulness problems, his forgery of a *Miranda* waiver, his successful manipulation of a witness to identify [Jean] when he and the detective knew that he had done no such thing, and related misconduct." Response at 12 (citing Exhibit A to the AC ("Exhibit A") [ECF No. 30-1]). Two problems with this. *First*, Jean wants us to read through 89 pages of reports to find the factual allegations he needs to support his claims. We "[j]udges are not like pigs, hunting for truffles buried in briefs." *United States v. Dunkel*, 927 F.2d 955, 956 (7th Cir. 1991). Ours is one of the busiest districts in the county, and we won't do Jean's work for him. *See Souther v. City of Gainesville*, 2025 WL 5095401, at *3 (N.D. Ga. June 2, 2025) (Jones, J.) ("Plaintiff must include his allegations in support of his claims in his amended complaint because the Court will not sift through exhibits attached to his Complaint to try to find support for his claims."); *Morales v. United States Fed. Gov't*, 2024 WL 4870091, at *3 (S.D. Fla. Nov. 22, 2024) (Elfenbein, Mag. J.) ("[D]istrict court judges

[8] "[A]s an alternative means of demonstrating deliberate indifference, the Supreme Court has 'simply hypothesized' about the possibility that a plaintiff might succeed in a failure-to-train-or-supervise claim 'in a narrow range of circumstances' where 'a violation of federal rights may be a highly predictable consequence of a failure to equip law enforcement officers with specific tools to handle recurring situations.'" *Rebalko*, 552 F. Supp. 3d at 1324–25 (quoting *Bryan Cnty.*, 520 U.S. at 409). In cases where "the need for more or different training is so obvious, . . . the policymakers of the city can reasonably be said to have been deliberately indifferent to the need." *Canton*, 489 U.S. at 390. But Jean never presses an "obviousness" theory of liability in the Amended Complaint. And for good reason: The Supreme Court has expressly rejected the notion that a *Brady* violation might constitute the (extremely) rare case in which a deficiency in training or supervision is "so obvious" that the City could be said to have been deliberately indifferent to the need for more or different guidance. *See Connick*, 563 U.S. at 64 (2011) ("Failure to train prosecutors in their *Brady* obligations does not fall within the narrow range of *Canton*'s hypothesized single-incident liability."); *see also Petkovich v. City of Montgomery, Ala.*, 2015 WL 263391, at *4 (M.D. Ala. Jan. 21, 2015) (Albritton, J.) ("[F]abrication of evidence is not within the 'narrow' category of cases in which 'the likelihood for constitutional violation is so high that the need for training would be obvious." (quoting *Canton*, 489 U.S. at 390 n.1)).

typically carry heavy caseloads but are equipped with limited resources, and, therefore, they cannot be expected to do a litigant's work for him. Here, Plaintiff impermissibly places the burden on the Court to sift through the Complaint's 51 pages and guess which of his factual allegations may or may not constitute a claim for relief." (quoting *Chavez v. Sec'y of the Fla. Dep't of Corrs.*, 647 F.3d 1057, 1061 (11th Cir. 2011) (cleaned up))), *report and recommendation adopted*, 2025 WL 209226 (S.D. Fla. Jan. 16, 2025) (Moore, J.).

*Second*, and in any event, having gone through those 89 pages ourselves, we can't say that they support Jean's claim. They appear to include mostly positive performance reviews about Detective Hill—obviously irrelevant to Jean's claim. *See, e.g.*, Exhibit A at 6 (listing the awards Detective Hill received, including "Officer of the Month Award," "Investigative Excellence Award," "Community Involvement Aware," "Chief's Special Recognition Award," "7 Commendations," and "5 Officer of the Month nominations and was not selected"); *id.* at 10 ("Det. Hill received the Meritorious Award in August 2005 . . . [and] should be highly commended."). There are (it's true) other parts of the 89 pages that document a years-long sexual relationship Detective Hill carried on with a woman. *See id.* at 16–38, 36 (documenting allegations that Detective Hill "became intimately involved with [the estranged] wife" of a detainee, but finding "no evidence" that Hill "acted improperly" in his official duties); *id.* at 38 ("Det. Hill had another issue arise involving this same female."). But these allegations don't help Jean either. For one thing, the documents suggest that Detective Hill had not "acted improperly" in maintaining that relationship. *Id.* ¶ 36. For another, Jean doesn't even try to explain how Detective Hill's sexual intimacy with a woman has anything to do with the City's supposed knowledge of a need to prevent *Brady* violations involving the fabrication of eyewitness testimony. *See Gold*, 151 F.3d at 1351 ("This Court repeatedly has held that without notice of a need to train or supervise in a particular area, a municipality is not liable as a matter of law for any failure to train and

supervise."); *ibid.* (holding that "the plaintiffs were not likely to succeed on the merits of their failure-to-train claim without proof that the City was aware of a prior incident in which constitutional rights were similarly violated"); *Connick*, 563 U.S. at 63 ("Because [the prior] incidents are not similar to the violation at issue here, they could not have put [the municipality] on notice that specific training was necessary to avoid this constitutional violation."); *Carter v. Columbus Consol. Gov't*, 559 F. App'x 880, 881 (11th Cir. 2014) (finding no pattern of constitutional violations where the past complaints against an officer were "unrelated" and "not connected" to the plaintiff's false-arrest claim); *Williams v. City of Birmingham*, 323 F. Supp. 3d 1324, 1334 (N.D. Ala. 2018) (Ott, Mag. C.J.) ("[C]ourts demand a high degree of factual similarity between prior incidents and the episode involving the plaintiff for the former to be relevant to § 1983 liability for an alleged failure to train or supervise.").

**b. Tolerance of Racial Profiling**

Next, Jean alleges that the City "tolerated racial profiling," AC ¶ 91—specifically, that Jean "and other Haitian American youth had been targeted by Detective Hill, in concert with other City police officers," *id.* ¶ 15. "This continued," Jean says, "even after the arrest of [Jean], when the North Miami Beach police actually used a six-pack collection of a majority of Haitian American children for firearm training exercise, which six-pack had a photo of then 14-year old [Jean] and another 15- year-old boy as two of the six individuals." *Ibid.* These allegations fail to satisfy *Monell*'s requirements.

"The Supreme Court has explained that the custom or policy must be the 'moving force' behind the constitutional deprivation for there to be sufficient causation." *Marantes*, 649 F. App'x at 672. In our case, Jean never connects the dots between the City's alleged custom of racial profiling and the purported custom of fabricating evidence and maliciously prosecuting innocent men. *See Carter*, 559 F. App'x at 881 (finding no pattern of constitutional violations where the past complaints against an officer were "unrelated" and "not connected" to the plaintiff's false-arrest claim); *Mercado*

*v. City of Orlando*, 407 F.3d 1152, 1162 (11th Cir. 2005) (finding no pattern of excessive force where the plaintiff could not "show that any [prior instances] involved factual situations that are substantially similar to the case at hand"). That the City's officers used photos of Haitian men "for [a] firearm training exercise" doesn't, at least on its face, have anything to do with the City's supposed custom of fabricating eyewitness testimony. *See Speight v. Griggs*, 620 F. App'x 806, 810 (11th Cir. 2015) ("We will likewise only find *Monell* liability for an allegedly unconstitutional custom or policy when there is an 'affirmative link' between the custom or policy and the constitutional violation[.]"). Plus, Jean never alleges that the City had notice *either* that officers used these photos "for [a] firearm training exercise" *or* that Detective Hill "targeted" "Haitian Youths[.]" AC ¶ 15. That's fatal to his claim because "municipal authorities must have known or have had reason to know that its officers were engaged in unconstitutional conduct as a precondition for municipal liability under" § 1983. *Kerr v. City of W. Palm Beach*, 875 F.2d 1546, 1557 n.19 (11th Cir. 1989); *see also* Gold, 151 F.3d at 1351 (holding that "without notice of a need to train or supervise in a particular area, a municipality cannot be liable as a matter of law"). Nor would the general statement that Detective Hill "targeted" "Haitian Youth" constitute the kind of "prior similar constitutional violations [that would] put the City on notice of its need to train officers." *Vielma v. Gruler*, 808 F. App'x 872, 882 (11th Cir. 2020) (emphasis added). We therefore have little difficulty concluding that Jean's racial-profiling theory fails to satisfy *Monell*'s requirements.

**c. Ratification**

Finally, Jean advances a cursory ratification theory. *See* AC ¶ 91 (alleging that the City, "through official policy, practice, or custom[,] . . . ratified Detective Hill's fabrication"). "[A] municipality can be held liable 'on the basis of ratification when a subordinate public official makes an unconstitutional decision and [the] decision is then adopted by someone who does have final policymaking authority.'" *Hoefling v. City of Miami*, 811 F.3d 1271, 1279 (11th Cir. 2016) (quoting *Matthews v. Columbia Cnty.*, 294

F.3d 1294, 1297 (11th Cir. 2002)). When (as here) a ratification theory is based on a single incident, the plaintiff "must demonstrate that local government policymakers had an opportunity to review the subordinate's decision and agreed with both the decision and the decision's basis before a court can hold the government liable on a ratification theory." *Salvato v. Miley*, 790 F.3d 1286, 1296 (11th Cir. 2015) (citations omitted); *see also ibid.* ("Only when 'the authorized policymakers approve a subordinate's decision and the basis for it' have they 'ratified' that 'decision.'" (quoting *City of St. Louis v. Praprotnik*, 485 U.S. 112, 127 (1988) (plurality))).

Jean doesn't even try to meet these requirements. On ratification, he says only that the City, "through official policy, practice, or custom . . . ratified Detective Hill's fabrications[.]" AC ¶ 91. To be sure, a plaintiff's burden at the motion-to-dismiss stage is low. A "plaintiff must simply allege a policymaker ratified the allegedly unconstitutional decision." *Kalchbrenner v. City of Bradenton*, 2025 WL 436766, at *9 (M.D. Fla. Feb. 7, 2025) (Scriven, J.). But Jean doesn't even do that. He never identifies a "policymaker" who had an opportunity to review Detective Hill's decision to fabricate false eyewitness testimony, and he thus never alleges that anyone at the City approved *either* Hill's decision *or* its basis. That's nowhere near sufficient to impose *Monell* liability—even at this early pleading stage of the case. *See Iqbal*, 556 U.S. at 678 ("Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice.").

True, the City didn't attack the ratification theory specifically in its Motion. *See generally* MTD. But that's probably because Jean advanced it only in passing—and without identifying any facts to support it. And, in any event, the City did attack the viability of the *Monell* claim generally. Given all this, we think the best course is to allow Jean to replead his *Monell* claim more cogently and to require him to identify the specific facts that (he thinks) support each of his theories of municipal liability.

* * *

"Experience teaches that, unless cases are pled clearly and precisely, issues are not joined, discovery is not controlled, the trial court's docket becomes unmanageable, the litigants suffer, and society loses confidence in the court's ability to administer justice." *Anderson v. Dist. Bd. of Tr. of Cent. Fla. Cmty. Coll.*, 77 F.3d 364, 366–67 (11th Cir. 1996). So, we'll give Jean ***one*** more chance to replead his *Monell* claim. *See* FED. R. CIV. P. 15(a)(2) (providing that district courts "should freely give leave [to amend] when justice so requires"). But he will be given no more chances. If he fails to file his second amended complaint on time and in compliance with the Federal Rules, our Local Rules, and this Order, we *will* dismiss it *with* prejudice.

## CONCLUSION

After careful review, therefore, we **ORDER and ADJUDGE** that the City's Motion to Dismiss Jean's Amended Complaint [ECF No. 57] is **GRANTED in part and DENIED in part**. We **DISMISS** the Amended Complaint [ECF No. 30] with leave to amend. If Jean wants to file a second amended complaint, he must do so by **November 16, 2026**.

**DONE AND ORDERED** in the Southern District of Florida on October 14, 2026.

_________________________________
**ROY K. ALTMAN**
**UNITED STATES DISTRICT JUDGE**

cc: counsel of record